**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE
CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Court of Appeals**

Michael Edmonds, Respondent,

v.

City of Columbia, Appellant.

Appellate Case No. 2019-001047

―――――――――――

Appeal From Richland County
Daniel Dewitt Hall, Circuit Court Judge

―――――――――――

Unpublished Opinion No. 2023-UP-134
Heard April 7, 2022 – Filed April 5, 2023

―――――――――――

**REVERSED**

―――――――――――

Chad Nicholas Johnston, of Burr & Forman LLP, and
Dana M. Thye, of the City Attorney's Office, both of
Columbia, for Appellant.

James Paul Porter, of Cromer Babb Porter & Hicks, LLC,
of Columbia, for Respondent.

―――――――――――

**PER CURIAM:** In this civil action, the City of Columbia (the City) appeals the
jury's verdict in favor of Michael Edmonds and award of $65,000 in damages on
his negligence claim. The City argues the circuit court erred in denying its motion

for judgment notwithstanding the verdict (JNOV) because no tort of "negligent separation" exists and no evidence supported recovery on any theory of negligence. We reverse.

**FACTS**

Edmonds began working as a firefighter for the City of Columbia Fire Department (the Fire Department) in July 1987. He earned several promotions throughout his thirty-year career, and in 2010, he was promoted to Assistant Chief of Administration.

In March 2016, the City hired a third-party consultant to complete an assessment of the Fire Department. City Manager, Teresa Wilson, sent a department-wide email to employees of the Fire Department, informing them of the assessment and encouraging their participation. She stated the meetings with the consultant would be confidential and the responses and results of the assessment would be reported anonymously. Edmonds met with the consultant on March 24, 2016. Later that day, Edmonds spoke to another employee, Assistant Chief George Adams, who told him the consultant indicated the person she interviewed before him "had a lot to say." Edmonds believed this comment referred to him, and he worried the consultant had divulged his statements. Edmonds emailed Wilson to express these concerns and his fear of "ramifications." Wilson responded that she would do all she could "to maintain the integrity and confidentiality" of the protocol the City had established.

About two months later, in June 2016, Edmonds met with Assistant City Manager, Allison Baker, and shared concerns similar to those he had shared with the consultant. Edmonds also emailed Baker "documentation" of these concerns. Baker subsequently shared this information with Fire Chief Aubrey Jenkins. Chief Jenkins called Edmonds into his office about a month later in July 2016 and questioned him about his complaints to Baker but took no further action at the time.

The following year, in May 2017, the Fire Department conducted an internal administrative investigation into the ethics of Edmonds's purchase of five hundred pairs of fire gloves following an allegation that Edmonds received a personal gain from the purchase. Although the investigator was unable to substantiate this allegation, he expressed concern with the procurement process because Edmonds relied upon an outdated field test in selecting the gloves. In addition, the investigator questioned whether the Fire Department would be able to use the

gloves because Edmonds purchased them in fifteen different sizes. Several weeks later, an internet blogger published a blog post accusing "a chief" of the Fire Department of making a questionable purchase of $60,000 worth of firefighting gloves. Less than a month thereafter, on July 5, 2017, Chief Jenkins requested Edmonds's resignation. Edmonds submitted his resignation two days later.

Edmonds then filed this action against the City, alleging causes of action for defamation, wrongful discharge, negligence, negligent misrepresentation, and promissory estoppel. As to his claim for negligence, Edmonds alleged the City owed him a "duty to conduct a confidential investigation" when it hired the consultant to investigate the Fire Department. Edmonds asserted this duty was based on the City's "ordinary duty to supervise its employees and agents, the representations it made to [Edmonds] and others about confidentiality, and the knowledge that harm could foreseeably occur to [Edmonds's] reputation if the [City] did not ensure and maintain confidentiality." He alleged the City failed to exercise slight care and "breached a duty to Edmonds and directly and proximately caused [Edmonds's] damages," including "lost wages, benefits, earning capacity, and the costs of prosecuting this action." Edmonds additionally alleged he suffered noneconomic damages, including "pain and suffering, humiliation, emotional distress, stress, and anxiety."

The City moved for summary judgment, arguing the record contained no evidence to establish the elements of negligence and that it was immune from liability pursuant to the South Carolina Tort Claims Act.[1] The trial court denied the City's motion for summary judgment, and the matter proceeded to a jury trial.[2]

During trial, Edmonds testified about his meeting with Baker and stated he "shared with [Baker] everything [he] had shared with everybody else." Edmonds recalled that during the July 2016 meeting in which Chief Jenkins confronted him about his statements to Baker, Chief Jenkins assured him everything would be "all right." However, Edmonds explained that from that point forward, he felt he had no face-to-face interactions with Chief Jenkins and the only way he could communicate with him was by phone. Edmonds stated the reasons Chief Jenkins

---

[1] *See* S.C. Code Ann. § 15-78-60 (2005) (providing a "governmental entity is not liable for a loss resulting from: . . . (5) the exercise of discretion or judgment by the governmental entity or employee . . . (14) any claim covered by the South Carolina Workers' Compensation Act, . . . [or] (20) an act or omission of a person other than an employee").

[2] Edmonds did not pursue his negligent misrepresentation claim at trial.

gave for asking for his resignation in 2017 were that "the fire stations [we]re falling apart and this glove thing [wa]s the final straw."

Baker agreed he forwarded Edmonds's email to Chief Jenkins but stated he never represented to Edmonds that his emails would be kept confidential. Baker stated that after seeing the report and Edmonds's email, Chief Jenkins discussed removing Edmonds, but Baker disagreed and suggested Chief Jenkins meet with Edmonds to resolve the issues. He stated that although he was not willing to agree with removing Edmonds in June 2016, twelve months later, he believed there was "much evidence to support the ineffectiveness of [Edmonds]."

Wilson testified the consultant's report included employees' anonymous criticisms of Chief Jenkins. She stated Edmonds was the first and only person who "gave [her] notice that they felt that the confidentiality was breached" and she had no reason to believe the consultant breached confidentiality.

After Edmonds rested his case-in-chief, the City moved for a directed verdict as to each of his causes of action. The trial court granted the motion as to Edmonds's wrongful discharge claim but denied the motion as to all other claims.

The City called Assistant Chief Adams to testify. He testified the consultant did not share anything with him about the survey. Assistant Chief Adams did not recall the conversation Edmonds described. He explained, "What I said was that he had a lot to say. And [the consultant] did not call a name."

The consultant testified her firm had worked with the City for thirty years and stated the City hired it to conduct a survey and interview 108 members of the leadership staff. She explained the survey was anonymous and the report was specific as to the content of responses but did not identify the persons making the comments. She stated she did not share any information with responders regarding what previous responders had shared, and she never provided any names of the responders or associated any comments with any of the responders when she discussed the results with the City.

Chief Jenkins testified Edmonds's responsibilities included logistics, equipment, and buildings. He explained that Edmonds ordered the fire gloves as part of his logistics responsibilities. Chief Jenkins recalled that when the order arrived, he examined the gloves and noticed an inscription on the inside that stated they were "not meant for firefighting." He stated this was "the final straw" in regards to Edmonds. He additionally noted he was concerned because the latest wear test had

not included those gloves in its recommendation.  Chief Jenkins explained that, prior to the glove issue, there had also been problems with the facilities.  He agreed the Fire Department did not have direct control over building services but stated Edmonds was responsible for ensuring the appropriate departments were held accountable.  Chief Jenkins testified no one told him what Edmonds said to the consultant but acknowledged he could "figure out" some things based on what members of his command staff "were always saying."  He stated he did not attribute any of the statements included in the survey to Edmonds.  Chief Jenkins acknowledged Baker forwarded him Edmonds's email but stated Edmonds had already raised the same concerns to him personally.  He testified he asked for Edmonds's resignation because he felt Edmonds was ineffective.  Chief Jenkins agreed the reasons he gave were the facilities issues and the glove issue.

At the close of the evidence, the City renewed its motion for directed verdict as to the remaining claims.  The trial court denied the motion for directed verdict but found for the City as to Edmonds's claim for promissory estoppel.  Thus, only the claims of defamation and negligence were submitted to the jury.

In his closing argument, Edmonds argued the City was negligent "in supervising the fire chief and handling [Edmonds's] confidentiality."  The trial court charged the jury on general negligence.  As to the negligence claim, the trial court's jury verdict form asked: "Was the defendant, the City of Columbia, negligent with respect to Michael Edmonds'[s] separation of employment?"

The jury found the City was negligent and awarded Edmonds $65,000 in damages.[3]  The City filed a written motion for JNOV and in the alternative, for a new trial.  The City first argued the trial court erred in failing to direct a verdict on the negligence claim because "negligent separation" of employment was not a cognizable cause of action and was the equivalent of a wrongful discharge claim. The City contended Edmonds never asserted a claim for negligent separation and the verdict form asked the jury whether the City was negligent as to Edmonds's separation of employment and did not mention confidentiality at all.  The City further argued "[s]ubmitting this cause of action to the jury was tantamount to asking the jury whether the City was negligent in how [it] separated [Edmonds] from employment" and thus imposed a duty on the City to use due care in deciding to terminate an employee.  The City argued this contradicted South Carolina's adherence to the principle of at-will employment and an employee's remedy was limited to an action in wrongful discharge, not negligence.  The City asserted

---

[3] The jury returned a verdict for the City on Edmonds's defamation claim.

Edmonds pursued such remedy by asserting his claim for wrongful discharge and the trial court directed a verdict on that claim. The trial court denied the City's motion. This appeal followed.

## ISSUE ON APPEAL

Did the trial court err in denying the City's motion for JNOV as to Edmonds's negligence claim?

## LAW AND ANALYSIS

The City argues the trial court erred in denying its motion for JNOV. It contends this court should reverse the jury's verdict for two reasons: (1) there is no tort of "negligent separation," and (2) the record contains no evidence to support recovery on any "recognized species of negligence." The City asserts public policy strongly favors at-will employment and no authority supports a claim against an employer for "negligence" or "negligent separation" arising from an employee's termination or resignation from employment. It further argues no evidence supports a claim for negligence arising from Edmonds's termination. The City contends the only remedy available to an at-will employee whose employer terminates his employment is a claim for wrongful discharge, a claim for which the trial court directed a verdict in the City's favor. We agree.

"On appeal from a circuit court's denial of a motion for a directed verdict or a JNOV, we apply the same standard as the circuit court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Gause v. Smithers*, 403 S.C. 140, 149, 742 S.E.2d 644, 649 (2013). "[This] court will reverse the trial court's ruling on a JNOV motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434-35, 629 S.E.2d 642, 648 (2006).

> In a negligence action, a plaintiff must show that (1) the defendant owes a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered an injury or damages.

*Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 135, 638 S.E.2d 650, 656 (2006). "An essential element in a cause of action for negligence is the

existence of a legal duty of care owed by the defendant to the plaintiff." *Huggins v. Citibank, N.A.*, 355 S.C. 329, 332, 585 S.E.2d 275, 276 (2003). "Duty is generally defined as 'the obligation to conform to a particular standard of conduct toward another.'" *Id.* at 333, 585 S.E.2d at 277 (quoting *Hubbard v. Taylor*, 339 S.C. 582, 588, 529 S.E.2d 549, 552 (2000)). "[T]he court must determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff." *Id.* at 332, 585 S.E.2d at 276. "If there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Sabb v. S.C. State Univ.*, 350 S.C. 416, 429, 567 S.E.2d 231, 237 (2002). "Foreseeability of injury, in the absence of a duty to prevent that injury, is an insufficient basis on which to rest liability. Foreseeability itself does not give rise to a duty." *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 289 S.C. 373, 376, 346 S.E.2d 324, 325 (1986) (citations omitted).

We find the trial court erred in failing to grant the City's motion for JNOV as to Edmonds's negligence claim because, as a matter of law, no cause of action for negligence in terminating one's employment exists.[4]

In *Gause v. Doe*, this court held the trial court properly dismissed a plaintiff's negligence claim against his employer when the claim arose from the employer's decision to terminate the plaintiff's employment. 317 S.C. 39, 42-43, 451 S.E.2d 408, 409-10 (Ct. App. 1994). There, an unidentified female accused the plaintiff, a police officer, of sexual assault. *Id.* at 41, 317 S.E.2d at 408-09. The plaintiff's employer then fired him. *Id.* at 41, 317 S.E.2d at 409. The plaintiff was charged with criminal offenses based on the accusation, but a grand jury returned a "no bill" on the charges. *Id.* The plaintiff sued his employer for negligence, arguing the employer was negligent in failing to adequately investigate the allegations,

---

[4] We acknowledge the City raised this argument in the context of its contention the trial court should find it was immune under the Tort Claims Act. However, because the City argued this point in its directed verdict motion addressing the negligence claim, we find this was sufficient to preserve the argument that no cause of action for negligent separation exists. *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 330, 730 S.E.2d 282, 285 (2012) ("While it may be good practice for us to reach the merits of an issue when error preservation is doubtful, we should follow our longstanding precedent and resolve the issue on preservation grounds when it *clearly* is unpreserved." (emphasis added)); *Johnson v. Roberts*, 422 S.C. 406, 412, 812 S.E.2d 207, 210 (Ct. App. 2018) (finding the appellant's arguments were preserved when the arguments were neither clearly preserved nor clearly unpreserved), *aff'd*, 427 S.C. 258, 830 S.E.2d 910 (2019).

assuming his guilt based upon those allegations, and failing to reevaluate his termination after the grand jury returned a no bill. *Id.* at 42, 317 S.E.2d at 409. This court stated that to prove his negligence claim, the plaintiff was required to show "(1) the [employer] owed him a duty to do or not to do any of the things alleged; (2) the [employer] breached this duty; (3) [the plaintiff] was injured[;] and[] (4) the [employer's] breach of duty proximately caused this injury." *Id.* This court held the plaintiff "fail[ed] to meet the first element of a negligence claim" because he did not "allege he was anything other than an at-will employee who could be terminated at any time, for any reason, or for no reason at all." *Id.* (footnote omitted). Here, as in *Gause*, Edmonds did not allege he was anything other than an at-will employee. Regardless of how Edmonds framed his negligence claim, the gravamen of his allegations was that the City was negligent for allowing his supervisor to request his resignation, effectively terminating his employment. As Edmonds acknowledged during oral argument, the alleged breach was allowing Chief Jenkins to force his resignation. No authority suggests the City had a duty to ensure the Fire Department continued to employ Edmonds. *See Sabb*, 350 S.C. at 429, 567 S.E.2d at 237 ("If there is no duty, then the defendant in a negligence action is entitled to a directed verdict."). Based on the holding in *Gause*, we conclude Edmonds failed to set forth a claim of negligence as a matter of law.

Further, *Sabb*, upon which Edmonds relies, does not stand for the proposition that an employee can sue an employer for negligence when a supervisor asks an employee to resign. Moreover, *Sabb* is distinguishable from both *Gause* and this case. In *Sabb*, the plaintiff sued the defendant for negligent supervision of her supervisor. 350 S.C. at 421-24, 567 S.E.2d at 233-35. The plaintiff testified that after she signed a petition concerning problems with her supervisor, he became openly hostile towards her. *Id.* at 424, 567 S.E.2d at 235. She then filed several grievances with the defendant complaining of the supervisor's behavior. *Id.* at 423-25, 567 S.E.2d at 234-35. The defendant found two of the plaintiff's complaints to be non-grievable, failed to respond to one, and denied her request on the other. *Id.* at 425, 567 S.E.2d at 235. The plaintiff claimed the supervisor's behavior caused her to have escalated blood pressure, problems sleeping, and panic attacks. *Id.* at 426, 567 S.E.2d at 236. In addition, she told the defendant she feared for her life because the supervisor had attempted to fight her. *Id.* The plaintiff requested a transfer to another department due to these hostile conditions and her suffering health. *Id.* Under those circumstances, the supreme court held "[a] duty arose on [the defendant's] part once [it] was placed on notice of [the supervisor's] behavior and actions" and after the defendant received grievances from employees, it "had a duty to address their concerns with due care." *Id.* at 429, 567 S.E.2d at 237.

Unlike Edmonds, the plaintiff in *Sabb* was not asked to resign; rather, she was transferred to a different department and thus did not allege her employer was negligent in forcing her resignation. *Id.* at 421, 567 S.E.2d at 233. Moreover, unlike Edmonds, she alleged her employer's negligence in failing to address her supervisor's hostile behavior caused her to have health problems. *Id.* at 426, 567 S.E.2d at 236. Here, Edmonds testified only that he felt he had no face-to-face interactions with Chief Jenkins and he was only able to communicate with him by phone. He did not allege this behavior caused him any distress. Rather, he alleged the "injuries" he suffered resulted from his forced resignation. Based on the foregoing, we conclude *Sabb* is distinguishable from *Gause* and therefore did not affect its holding. Thus, *Sabb* does not support a claim for negligence in terminating one's employment.

For the foregoing reasons, we conclude Edmonds's negligence claim fails as a matter of law. We therefore find the trial court erred in failing to grant the City's JNOV motion as to the negligence claim and we reverse.

The City additionally argues Edmonds's negligent supervision claim fails because no evidence showed either the consultant or Chief Jenkins committed a tort. The City further contends the trial court instructed the jury on general negligence over its objection that the verdict form should have been limited to whether the City failed to use reasonable care in supervising the outside consultant because that was the only negligence claim properly before the court. Because our decision on the prior question is dispositive, we need not address the City's remaining arguments.[5] *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding it was not necessary for an appellate court to address the appellant's remaining issues when the court's disposition of a prior issue was dispositive).

**REVERSED.**

**WILLIAMS, C.J., and KONDUROS and VINSON, JJ., concur.**

---

[5] Given that the trial court instructed the jury only as to general negligence and the jury verdict form did not reference negligent supervision, we note no claim of negligent supervision was submitted to the jury.